IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

**BAER, C.J., TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| IN THE INTEREST OF K.N.L., A MINOR | : | No. 1 EAP 2022 |
| | : | |
| | : | Appeal from the Judgment of |
| APPEAL OF: L.B. A/K/A T.B. | : | Superior Court entered on |
| | : | September 28, 2021 at No. 409 EDA |
| | : | 2021 affirming in part, vacating in |
| | : | part and remanded in part the Order |
| | : | dated January 26, 2021 in the Court |
| | : | of Common Pleas, Philadelphia |
| | : | County, Juvenile Division at No. CP- |
| | : | 51-AP-0000172-2017. |
| | : | |
| | : | ARGUED:  May 18, 2022 |

## OPINION

**JUSTICE DOUGHERTY**                              **DECIDED:  October 19, 2022**

We granted discretionary review to examine whether the lower courts applied appropriate standards for evaluating, and rejecting, a former caregiver's asserted *in loco parentis* status for purposes of standing to intervene in a proceeding to adopt a child in the custody of a foster care agency, pursuant to the Adoption Act, 23 Pa.C.S. §§2101-2938.  For the reasons that follow, we reverse and remand with instructions for a hearing in the juvenile court *de novo*.

### Background

History of the case

K.N.L. (the child), born in March of 2010, was adjudicated dependent and committed to the custody of the Philadelphia Department of Human Services (DHS) in 2015; she has resided in various foster homes for seven years, since just after turning

five years old. The parental rights of the child's biological parents were terminated involuntarily on March 6, 2017, and on the same date, the juvenile court vacated the custodial and visitation rights of the child's former caregiver, R.B.P., who had been the legal guardian at the time she entered foster care.[1] With the child's parents and guardian removed as parties, custody of the child transferred to DHS, and further review of the dependency matter proceeded on the juvenile court's adoption docket.[2] *See* 23 Pa.C.S. §§2521(b) (decree of termination "shall award custody of the child to the agency or . . . the petitioner in the . . .proceeding . . . for involuntary termination") and (c) (agency receiving custody "shall stand in loco parentis to the child" and "shall have [such] authority . . . concerning the child as a natural parent could exercise"). In 2018, with the support and consent of DHS, the child's foster parent filed a report of intention to adopt and petition to adopt the child, and completed all investigations and evaluations required to finalize the adoption. Prior to the finalization, the child's biological maternal aunt, D.M., filed a motion to intervene in the adoption matter as well as a petition to adopt the child. Thereafter, the child was removed from the pre-adoptive foster home and the foster parent requested to withdraw her pending adoption petition, which the court granted on September 17, 2019.

---

[1] R.B.P. appealed the juvenile court's orders dated August 3, 2015 (adjudicating child dependent and committing her to the legal custody of DHS); November 14, 2016 (suspending visits contingent upon a trauma therapist's recommendation to reinstate them); and March 6, 2017 (vacating guardianship and changing the permanency goal to adoption). The Superior Court affirmed these decisions, and this Court denied allowance of appeal. *See In re K.L.*, 2767 EDA 2015, 2016 WL 2353033 (Pa. Super., May 4, 2016) (unpublished memorandum); *Interest of K.L.*, 3886 EDA 2016, 1185 EDA 2017, 2018 WL 1322572 (Pa. Super., Mar. 15, 2018) (unpublished memorandum), *alloc. denied*, 194 A.3d 119 (Pa. 2018) (Table).

[2] In Philadelphia County, jurisdiction over adoptions is exercised through the juvenile division of family court, rather than through the orphans' court division as is the case in all other counties. *See* Pa. Const. art. V, §16(q)(iii); 20 Pa.C.S. §§711, 713.

Subsequently, appellant T.B.,[3] who is the adult child of former guardian R.B.P., also sought to intervene in the proceeding to adopt the child. By motion to intervene filed December 12, 2019, appellant claimed he had been a romantic partner and longtime friend of the child's biological mother, as well as a live-in parental caregiver for the child from the time she was four days old until her removal from R.B.P.'s home, and has since maintained contact and a strong parental bond with the child; these factors, he asserted, demonstrated *in loco parentis* status[4] and established his standing to intervene in the adoption. *See* Motion to Intervene of [T].B., 12/12/2019, at 1-2. On January 3, 2020, appellant also filed a petition to adopt the child.

The established facts indicate the child's biological mother was incarcerated at the time of her birth in March of 2010, and has been incarcerated for all but a few months of the child's life. Biological mother relinquished care and custody of the newborn to R.B.P., and a few days later appellant, who had also been in jail on the day the child was born, joined his own mother and the child in R.B.P.'s home. Juvenile Court Op., 3/24/2021, at 2, 6, *citing* Testimony of [T].B., N.T. 1/26/2021 at 30. They resided and cared for the child together for the next five years. *Id.*, *citing* N.T. at 16. The child's biological mother also lived with them for approximately five months, after which she ultimately returned to

---

[3] The initials "T.B." reflect the functional name of appellant, also known by "L.B." corresponding to his legal name and sex assigned at birth. Throughout the record, appellant is referenced using both male and female prefixes and pronouns, and intermittently as R.B.P.'s "daughter." Herein, we refer to appellant as "appellant" or "T.B." and by "he/him" pronouns.

[4] Explained in greater detail *infra*, "*in loco parentis*," meaning "in the place of a parent," refers to a person who "acts in place of a parent, either temporarily (as a schoolteacher does) or indefinitely (as a stepparent does); a person who has assumed the obligations of a parent without formally adopting the child." Black's Law Dictionary (11th ed. 2019) ("person in loco parentis"). *See generally Peters v. Costello*, 891 A.2d 705, 710 (Pa. 2005) (explaining common law doctrine conferring standing based upon *in loco parentis* status).

prison. *Id.*, *citing* N.T. at 18. The child identified R.B.P. as "Mama" and appellant as "Dada." *See In re K.L.*, 2016 WL 2353033, at *1 n.2. The child's removal from R.B.P.'s home in 2015 occurred during DHS's investigation of a child protective services (CPS) report raising abuse allegations against R.B.P., which later included allegations against appellant as well. Juvenile Court Op., 3/24/2021, at 1- 2, *citing* N.T. at 19, 21. Appellant was not named as a party in the dependency petition, is not on the child's birth certificate, and has never been a legal guardian. *Id., citing* N.T. at 22-23.

The record[5] further reveals the abuse allegations were unfounded.[6] *See In re K.L.*, 2016 WL 2353033, at *1, 4. However, during the investigation, it became apparent the five-year-old child had significant, aggressive and sexualized behavioral health issues which, in the court's view, R.B.P. was not adequately addressing. *Id.* The juvenile court,

---

[5] In relation to the underlying dependency matter, the certified adoption court record includes the full dependency court docket with entries containing texts of orders from each court listing, the Superior Court's memorandum affirming the adjudication of dependency, and petitions and exhibits from the proceeding to terminate parental and custodial rights. Additionally, the Superior Court's non-precedential memoranda deciding R.B.P.'s appeals in the dependency matter, *see supra* n.1, are official court records available to the public, and are subject to judicial notice.

[6] The allegations consisted of reports of inappropriate touching made by the child to physicians treating her urinary tract infection. *See* Safety Plan dated 3/22/2015, [T].B. Exhibit 1; *Interest of K.L.*, 2018 WL 1322572, at *1. The resulting CPS investigation involved several specialized medical, behavioral, and forensic evaluations of the child which identified the child's behavior as consistent with exposure to sexual trauma; however, no conclusion was reached regarding the source, noting the child would state "something is wrong with me" but could not pinpoint what, and would state either "Mama" or "Dada" touched her, then during the same examination, recanted and disclosed someone else had touched her, including the DHS investigator. Evaluation dated 7/17/2015. In its petition to terminate parental rights, DHS later averred the child's biological mother had at least six older children, all of whom had been removed from her custody by DHS before the child's birth for reasons unrelated to her incarceration, and each child exhibited similar behavioral health concerns. Petition for Involuntary Termination of Parental Rights, 2/14/2017, at 24-25 ¶¶(v)-(cc), ¶(ee), 27 ¶(nn). DHS also averred substantiated prior investigations involving R.B.P. and the care of her biological children, including appellant when he was a minor. *Id.* at 27 ¶(kk).

following an off-the-record sidebar conversation and stipulation by counsel, stated on the record he suspected appellant (who was not a party to the proceeding and does not appear on the docket as present at the hearing) was responsible for "whatever happened" and acknowledged testimony to the effect appellant no longer lived with R.B.P.[7] *Id.* at *4. The court ultimately adjudicated the child dependent under the Juvenile Act, 42 Pa.C.S. §§6301-6375, based on a finding the child was without proper parental care and control. *See id.* at *3-4; *Interest of K.L*, 2018 WL 1322572, at *2, 6; Dependency Docket entry dated 8/3/2015; *see also* 42 Pa.C.S. §6302(1) ("Dependent child" is, *inter alia*, "without proper parental care or control . . . necessary for his physical, mental, or emotional health, or morals . . . [which] may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]").

From commencement of the dependency case until the juvenile court vacated her custodial rights two years later, R.B.P. was named alongside the child's biological parents as a party to the dependency proceeding; as a result, she was appointed counsel, attended hearings, exercised visitation and educational rights, and was engaged in the family's case plan as a reunification resource. The docket entries do not list appellant as a person in attendance at any of the hearings. *See* Dependency Docket, entries dated 4/2/2015-11/14/2016.[8] In seeking intervention, appellant averred he "has always been a

---

[7] Specifically, the court stated, "'Do I believe something happened? Yes. Do I think it was with you [R.B.P.]? No. Based upon the testimony, was that your daughter that lived with you? . . . I suspect it was your daughter. . . . However, with whatever happened, this young child has a lot of issues, now. So we have to deal with those issues before we send her [back].'" *In re K.L.*, 2016 WL 2353033, at *3-4, *quoting* Dependency Hearing N.T. 8/3/2015 at 8-9.

[8] There were stay-away orders entered on the dependency docket, beginning in May 2016, prohibiting appellant from contact with the child at her foster home and school. *See* Dependency Court Docket, entries dated 5/11/2016, 7/27/2016, 11/14/2016.

placement and visitation resource since the child has been deemed dependent." Motion to Intervene at 2.

Adoption court proceeding

The juvenile court scheduled a hearing on appellant's motion to intervene for January 26, 2021. Although there were no responsive motions or preliminary objections to appellant's motion, and the parties did not exchange exhibits or offers of proof, the child advocate filed a pretrial memorandum the day before the hearing which included a list of potential witnesses and exhibits, and a statement asserting opposition to appellant's standing. Child Advocate's Pre-Trial Memorandum, 1/25/2021, at 6-8. Appellant was the only witness at the hearing, which was virtual. His testimony proceeded without objection. He explained his relationship to the child was as her previous caretaker and they both identified him as her dad; he had been engaged to the child's mother at one time, they later planned to raise a child together, and because they were both in jail on the day the child was born, he called his mother (R.B.P.) from prison and asked her to "get [his] daughter," which she did. N.T. at 30. Along with R.B.P., appellant took the child to medical appointments, registered her for preschool, and took her there and back every day. According to appellant, when the child was removed from the home, he presented himself as a placement resource, but was ruled out and does not know why; he had some contact with the child since her removal and has attempted to maintain a relationship with her. Appellant agreed there had been allegations of abuse made against him as well as his mother, but the petition to remove the child was filed against his mother and the child's mother only.

When asked why he did not file for legal custody, appellant testified he was attempting to get parts of his criminal record expunged of charges acquired as a juvenile,

though they were certified as adult charges.[9] He provided the dates of those and subsequent charges and answered questions about them; the court observed the felony charges on appellant's record, which could not be expunged, included theft charges and were *crimen falsi*. The child advocate began to cross-examine appellant regarding the child abuse allegations, however the court halted the line of questioning. Appellant then testified he has since become a certified foster parent, which required him to submit to clearances and background checks, and has had one foster child in his care for a year. He also provided the court with a home investigation report and safety plan from an early stage of DHS's 2015 investigation, prior to the child's (K.N.L.'s) removal, which listed appellant and R.B.P. as the adult caregivers in the home, noted the child had made allegations against R.B.P., and noted the child was safe in the home with appellant assigned as the responsible party to supervise. *See* Safety Plan dated 3/22/2015, [T].B. Exhibit 1.

No other evidence was provided. DHS and the child advocate stated their objections to appellant's standing. The child advocate argued there was a finding of dependency for lack of parental care and control during the period appellant said he provided care, which should preclude standing; in addition, the child advocate considered there to be "no credible testimony or evidence [appellant] resided with the biological mother of this child. Instead, there was credible testimony [appellant] resided with his mother, who was a legal guardian of the child." N.T. at 41-43. Counsel for DHS requested an adverse credibility finding against appellant, and argued binding precedent and the Adoption Act precluded standing. Specifically, DHS argued that in order to have standing,

---

[9] The juvenile court noted that, "[w]hen testifying regarding the prior convictions, [appellant] initially stated that the convictions were for juvenile charges. However, [appellant] later testified [he] was convicted on several offenses, none of which were juvenile, including: identity theft and unlawful taking by deception." Juvenile Court Op., 3/24/2021, at 2, *citing* N.T. at 23, 25.

an adoption petitioner must have the consent of the agency under Section 2711 of the Act, or be a blood relative under Section 2531(c) (which excuses certain family members from filing a report of intent to adopt). Moreover, according to DHS, the "number one" reason appellant did not have standing was because binding Superior Court precedent, required a party in an adoption matter must "**currently** stand *in loco parentis* — **not previously** stand in loco parentis — or obtain written consent [of the guardian]." N.T. at 44-46 (emphasis added), *citing In re Adoption of A.M.T.*, 803 A.2d 203 (Pa. Super. 2002).

The juvenile court denied appellant's motion to intervene for lack of standing.[10] The court explained its decision was based on prerequisites for third party standing in adoption matters, which dictated such standing exists only when specified by statute or demonstrated by current *in loco parentis* status, *i.e.*, where the third party is "currently" assuming parental obligations in the place of a lawful parent. Juvenile Court Op., 3/24/2021, at 4-5. The court relied on the Superior Court's decisions in *In re N.S.*, 845 A.2d 884, 886-87 (Pa. Super. 2004) (third party "must establish that she either **currently** acts *in loco parentis* to the prospective adoptee or has obtained the written consent from the guardian . . . [i]n order for a third party to pursue such adoption or visitation, the party must have standing, and standing for a third party can exist only where the legislature has specifically conferred it or where the party stands *in loco parentis* to the child.") (emphasis added), and *Adoption of A.M.T.*, 803 A.2d at 208 n.4 ("[T]o have standing to file a petition for adoption, a third party must either establish that he or she acts **currently** *in loco parentis* to the prospective adoptee or has obtained the written consent from the guardian of the adoptee.") (emphasis added). *Id.* The court reasoned appellant therefore needed either to have the written consent of DHS in compliance with the Adoption Act,

---

[10] On the record, the court stated, "I did have some issues with respect to the credibility, but it wasn't credibility that was the overwhelming decision." N.T. 1/26/2021 at 46.

*see id., citing* 23 Pa.C.S. §2711 (requiring consent to adopt by guardian or person having custody of minor adoptee), or to show he **currently** acts *in loco parentis*, which, in the court's view, occurs where a third party and biological parent reside together as a family unit, *id., citing T.B. v. L.R.M.*, 786 A.2d 913, 916 (Pa. 2001), but is not established where a third party acts "solely as a 'caretaker'[,]" *id., quoting D.G. v. D.B.*, 91 A.3d 706, 710-11 (Pa. Super 2014).

Citing appellant's testimony as the record source for its factual findings, the juvenile court viewed the following "factors" as demonstrating appellant could not establish *in loco parentis* status. First, despite biological mother's relinquishment of custody to appellant's mother, appellant never became a legal guardian of the child. *Id.* at 5-6. Second, appellant was not named as a party to the dependency matter "as there was no existing biological or legal relationship to the [c]hild at the time of her removal." *Id.* at 6. Third, appellant and biological mother "rarely resided together as a family unit, except for a very brief period . . . [t]his demonstrates [a] family unit between biological mother, [c]hild and [T].B. never existed." *Id.* And, "[m]ost significantly," the court concluded appellant did not "currently" act *in loco parentis* because he had not resided with the child in over five years, during which time she has been in the custody of DHS. *Id.* at 5.

Appeal to the Superior Court

On appeal, a three-member panel of the Superior Court approved of the juvenile court's application of caselaw regarding *in loco parentis* status in relation to adoption matters, and affirmed the denial of appellant's motion to intervene on that basis. *See Interest of K.N.L.*, 409 EDA 2021, 2021 WL 4440535, at *14-17 (Pa. Super., Sept. 28,

2021) (unpublished memorandum).[11]   Responding to appellant's argument the juvenile court had misapplied precedential authority, the panel analyzed *In re Adoption of Hess*, 608 A.2d 10 (Pa. 1992), in light of subsequent decisions of the Superior Court.  *See id.* at \*15, *quoting Hess*, 608 A.2d at 15 ("child's interests are best served when all those who demonstrate an interest in his or her welfare are allowed to be heard . . . [t]herefore . . . grandparents should have been welcomed by the agency to offer what information they could in relation to their grandchildren's best interests").   In *Hess*, this Court considered the effect of an agency's withheld consent on biological grandparents' standing to intervene in their grandchildren's adoption after parental rights had been terminated.  The *Hess* Court observed Section 2713 of the Adoption Act authorized the adoption court, in its discretion, to dispense with certain consents otherwise required by the Act, including the guardian's; the Court noted an inquiry into the child's best interests was required to determine whether agency consent was unreasonably withheld, and therefore irrelevant to the threshold issue of the grandparents' standing.  *See Hess*, 608 A.2d at 14, *citing* 23 Pa.C.S. §2713(2) ("[T]he court, in its discretion, may dispense with consents other than that of the adoptee . . . when … the adoptee is under 18 years of age and has no parent living whose consent is required.").

Comparing the facts of *Hess*, the panel relied on *Adoption of A.M.T.* and *In re N.S.*, to hold standing may be conferred in the absence of a guardian's consent only where the petitioner shared a close family relationship with the child, such as a grandparent.  *Interest of K.N.L.*, 2021 WL 4440535, at \*16-17.  The *A.M.T.* panel held the guardian's consent

---

[11] The Superior Court additionally disposed of several claims of abuse of discretion raised by appellant, and reversed the juvenile court's *ex parte* issuance of a stay-away order prohibiting appellant's contact with the child, which was based on allegations made by the child advocate after the court dismissed appellant.  *See Interest of K.N.L.*, 2021 WL 4440535, at \*3-13, 17-20.  These aspects of the panel's decision are not encompassed within our grant of allocatur and we do not review them here.

was not a prerequisite for standing where both of the competing prospective adoptive families consisted of the children's biological aunts and uncles, while also "'recogniz[ing] that the [c]ourts have clearly rejected attempts to extend the application of *Hess* to third parties who do not have a familial relationship with the adoptees.'" *Id.* at \*16, *quoting A.M.T.*, 803 A.3d at 207-09 (collecting intermediate appellate cases); *see also id.* at \*17, *citing In re N.S.*, 845 A.2d at 886-87 (former foster parent lacked *in loco parentis* status and standing to pursue visitation or adoption where, after termination of parental rights, the agency had custody, stood *in loco parentis*, and did not consent).[12]

Issue and Standard of Review

We granted the petition for allowance of appeal filed by T.B. to consider whether the juvenile court misinterpreted or misapplied the law when it denied appellant standing to intervene in the adoption of the child "despite uncontroverted proof that [he] stood *in loco parentis* for the subject child by assuming the role of parent and discharging parental duties[.]" *Interest of K.N.L.*, 270 A.3d 1103 (Pa. 2022) (*per curiam*).

Issues of standing generally raise pure questions of law for which we employ *de novo* review of a trial court's decision. *Markham v. Wolf*, 136 A.3d 134, 138 (Pa. 2016). As well, a challenge to asserted *in loco parentis* status in a particular context typically involves a fact-intensive inquiry, and may implicate mixed questions of law and fact. *See C.G. v. J.H.*, 172 A.3d 43, 54 (Pa. Super. 2017), *aff'd*, 193 A.3d 891 (Pa. 2018). Where factual findings and credibility determinations are at issue, we will accept them insofar as they are supported by the record. *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). In matters arising under the Adoption Act, as well as appeals of child custody and dependency decisions, our plenary scope of review is "of the broadest type;" that is, an

---

[12] The panel also addressed other authorities supplied by appellant, which included cases and statutory provisions related to standing in child custody actions, and deemed them inapposite to a determination regarding standing in an adoption proceeding. *See id.* at \*17.

appellate court is not bound by the trial court's inferences drawn from its findings of fact, and is compelled to perform a comprehensive review of the record for assurance the findings and credibility determinations are competently supported. *T.B. v. L.R.M.*, 786 A.2d 913, 916 (Pa. 2001); *see In re Adoption of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021).

**Arguments**

Appellant, T.B.

Appellant argues the juvenile court erred in holding *in loco parentis* status must be "current" in order to establish standing to intervene in an agency-initiated adoption proceeding. According to appellant, the court's edict demands an intervenor to presently act in the place of a parent at the time an action commences, and this premise is not only an inappropriately inflexible standard for matters affecting a child's best interests, but also places an insurmountable burden on any prospective adoptive parent who previously assumed parental duties for a child later placed in foster care.

Appellant relies on cases involving standing in private child custody actions between former same-sex partners who had not (or legally could not have, at the time) been legally married. He observes these decisions likened the role of the nonbiological parents to one of step-parent, and viewed the key criteria for *in loco parentis* standing as the assumption of the role of a parent, and a discharge of parental duties. *See* Appellant's Brief at 18-20, 24-25, 38. He argues this inquiry is not contingent upon "current" *in loco parentis* status, and notes these issues arise only after a separation. Appellant asserts this Court, in *T.B. v. L.R.M.*, affirmed standing to seek partial custody five years after the parties separated, and in *C.G. v. J.H.*, further articulated "'the relevant time frame to determine whether a party stands *in loco parentis* is when the party developed the relationship with the child[.]'" Appellant's Brief at 17-19 & n.6, *quoting C.G. v. J.H.*, 193 A.3d at 910. Instead of "currentness," appellant asserts, "'where the child has established

strong psychological bonds with a person who although not a biological parent, **has lived with the child** and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent . . . the child's best interest requires that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained[.]'" *See id.* at 16-21 & 18 n.6, *citing and quoting T.B. v. L.R.M.*, 786 A.2d at 917 (emphasis supplied by appellant); *J.A.L. v. E.P.H.*, 682 A.2d 1314, 1319-21 (Pa. Super. 1996) (evidence biological parent's child and former partner were comembers of nontraditional family established *in loco parentis* standing to seek custody; "a third party who **has stood** *in loco parentis* [possesses] a prima facie right sufficient to grant standing") (emphasis supplied by appellant). Appellant argues these decisions caution against placing "'overly technical and mechanistic'" applications of standing principles before more important factors involving the child's best interests, including critical psychological bonds formed with parental caregivers during early childhood. *See id.* at 17, 20-21, *quoting J.A.L.*, 682 A.2d at 1318; *T.B.*, 786 A.2d at 917.[13]

Recognizing standing in custody and visitation matters is generally limited to parties expressly authorized via the custody statute, appellant observes the Adoption Act provides "'[a]ny individual may become an adopting parent.'" *Id.* at 36, *quoting* 23 Pa.C.S. §2312. Appellant concedes the adoption court is not authorized to dispense with the consent of the child, who is now twelve years old, but contends, under *Hess*, the adoption court may forego consent of DHS if in the child's best interests to do so. Appellant emphasizes the issue of consents is one for the merits of the adoption petition, not relevant to the threshold issue of standing, which does not consider success on the

_____

[13] Subsequent to the decisions in *J.A.L. v. E.P.H.* and *T.B. v. L.R.M.*, the General Assembly has several times amended Section 5324 of the statute, which, since 2010, has included "[a] person who stands in loco parentis to the child" among individuals who "may file an action . . . for any form of physical custody or legal custody". 23 Pa.C.S. §5324; Act of Nov. 2010, P.L. 1106, No. 112 at §§5324-5325.

merits. *See id.* at 22-24, *citing Hess* 608 A.2d at 14. Appellant argues a proper standing inquiry — rather than the juvenile court's restrictive ruling — ensures a party seeking intervention in an adoption matter has a "'substantial interest in the subject matter of the litigation that must be direct and immediate[.]'" *Id.* at 13, *quoting In re Adoption of J.E.F.*, 902 A.2d 402, 412 (Pa. 2006). He contends he established such an interest by demonstrating he assumed a parental role and discharged parental duties through his unrefuted testimony relating to the care he provided for the first five years of the child's life — during which time, he asserts, strong, persisting parental bonds inevitably developed between the two. Conceding *in loco parentis* status may end in some circumstances, appellant argues it does so at the election of the third party or the child, and in any event does not simply expire unless the parties understood the parent's delegation was only temporary. *See id.* at 25-28, *citing* 28 AM. JUR. 2D *Proof of Facts* §545 (1981) (*in loco parentis* status is "susceptible of abrogation at will by either the person thus standing or by the child"). In appellant's view, just as a natural parent does not become a stranger as a result of a separation or the child reaching the age of majority, the same should hold for a third party who has acted *in loco parentis* to the child. Appellant does not ask this Court to grant him standing, but rather requests remand for a new hearing before the juvenile court in relation to the appropriate legal standard, which in appellant's view, examines both historical and current aspects of *in loco parentis* conduct for the assumption of a parental role and discharge of parental duties. *See id.* at 40.

Appellees, DHS and Child Advocate

DHS and the child advocate (together, co-appellees) advance overlapping arguments in opposition to appellant's claim of standing; they view the juvenile court's decision as a proper analysis of the totality of circumstances, and assert appellant failed

to meet his burden to "'prove that a parent-like relationship has been forged through the parties' conduct[,]'" *i.e.*, to persuade the court he ever assumed the legal duties and obligations of a parent. Brief of DHS at 18, *quoting J.A.L.*, 682 A.2d at 1321; Brief of Child Advocate at 10. They argue the evidence instead demonstrates appellant never assumed parental duties for the child, either before her placement into foster care or in the seven years thereafter. In support of this perspective, co-appellees assert a litany of purported omissions and failures by appellant, including, *inter alia*, his lack of mention on the child's birth certificate despite what they view as contrary testimony he and the child's biological mother planned to have and raise the child together, his failure to obtain any form of custody prior to the child's removal, and his failure to contest the removal, or to intervene in the dependency matter or participate in any other way as a resource for the child. They contend appellant's only evidence of any bond or ongoing contact with the child is his own "self-serving" testimony, which they argue the juvenile court discredited, and this Court is bound by the trial court's credibility determinations, as well as its factual findings demonstrating appellant's lack of standing. Brief of DHS at 22, *citing* Juvenile Court Op., 3/24/2021, at 2, 5-6. The child advocate additionally argues appellant did not act in the place of a parent to the child because the child was adjudicated dependent, *i.e.*, found to be lacking necessary parental care and control, as a result of the care appellant asserts he was providing at the time the child was removed. Brief of Child Advocate at 30. Co-appellees argue a proper challenge to the dependency findings and foster care placement would have been via intervention in the dependency matter. *See id.*; Brief of DHS at 20.

Even if appellant had established he was a primary caregiver for the child prior to her removal, co-appellees view standing to intervene in adoption cases as limited to individuals having current custody or physical care of the child under Section 2531(a) of the Adoption Act, or those with a close familial relationship recognized by the Act in

Section 2531(c).  Brief of DHS at 16 & n.5, *citing* 23 Pa.C.S. §2531 (requiring "[e]very person now having or hereafter receiving or retaining custody or physical care of any child for the purpose or with the intention of adopting a child" to file a Report of Intention to Adopt unless the adoptee is "the child, grandchild, stepchild, brother or sister of the whole or half blood, or niece or nephew by blood, marriage or adoption").  Otherwise, in co-appellees' view, to establish standing, "the individual must 'either currently act[] *in loco parentis* to the prospective adoptee or ha[ve] obtained the written consent from the guardian of the child'" pursuant to Section 2711(a)(5), and appellant here established neither; they further recognize, under *Hess* and Section 2713, a court may dispense with the Section 2711 guardian-consent requirement where it is found to be unreasonably withheld, but refute the relevance of Section 2713 here, where there was no such finding. *Id.*, *quoting In re N.S.*, 845 A.2d at 886; *id.* at 16 n.6, *citing Hess*, 608 A.2d at 14.  DHS further argues appellant "focuses too much" on a particular meaning of the word "current," and claims appellant cannot assert *in loco parentis* in defiance of DHS who, since parental rights were terminated, currently stands *in loco parentis* under Section 2513 of the Act and is the child's effective parent.  *See id.* at 25-26, *citing T.B. v. L.R.M.*, 786 A.2d at 916-17 (third party "can not place himself *in loco parentis* in defiance of the parents' wishes and the parent/child relationship"); *see* Brief of Child Advocate at 22.

Moreover, co-appellees contend appellant waited five years to assert any legal interest in the child, resulting in now seven years of failure to perform any parental duties, which demonstrates he abandoned any *in loco parentis* status he may have once had. Brief of DHS at 19-20, *citing In re Adoption of Wims*, 685 A.2d 1034,1036-37 (Pa. Super. 1996) (former pre-adoptive foster parents, who previously had *in loco parentis* status, did not contest children's removal from home and waited five months to attempt to intervene, no longer had standing in adoption); Brief of Child Advocate at 37-38, *citing*, *inter alia*, *In*

*re C.R.*, 111 A.3d 179, 186 (Pa. Super. 2015) (former foster parent, who waited six months and several permanency reviews to attempt intervention after foster children's removal, did not have standing to intervene in dependency matter). DHS contends appellant was not entitled to "wait[] for a more convenient time for himself to seek standing, without regard to [the c]hild's needs and welfare." Brief of DHS at 10. The child advocate further argues appellant does not meet the requirements to intervene under Rule of Civil Procedure 2327, which allows intervention for an individual who "could have joined as an original party in the action" or where "the determination of such action may affect any legally enforceable interest of such person." Brief of Child Advocate at 14-16 *quoting* Pa.R.Civ.P. 2327(3), (4). Rule 2327 intervention, argue co-appellees, is available only to those with consent, a close familial relationship, or current *in loco parentis* status pursuant to Sections 2531 and 2711 of the Act, and appellant either never had such an interest, or he abandoned it. Noting intervention under Rule 2329 should be refused where "'the petitioner has unduly delayed in making application for intervention or the intervention will unduly delay, embarrass or prejudice the trial or the adjudication of the rights of the parties[,]'" the child advocate urges the Court to affirm the lower courts' decisions because appellant's attempt to intervene was not only unduly delayed, but serves to further delay permanency for the child. *Id.* at 36, *quoting* Pa.R.Civ.P. 2329(3).

<u>Appellee, D.M.</u>

D.M., the child's maternal aunt whose petition to adopt her was also pending before the juvenile court, compactly observes DHS and the child advocate evade the central issue of standing as they lack any suggestion appellant would not be aggrieved by its denial. Brief of D.M. at 2, *citing In re Adoption of B.E.W.G.*, 513 A.2d 1061, 1064 (Pa. Super. 1986) ("The core concept in standing questions is whether the person seeking relief is adversely affected or aggrieved in any way by the matter which he seeks to

challenge through the judicial process.") (quotation marks omitted). D.M. asserts the child's interests would best be served if she can be adopted by a relative or, alternatively, someone with a developed familial bond, such as appellant. D.M. thus argues appellant is aggrieved if denied the opportunity to intervene at this stage, before he can show if he is qualified to adopt. Additionally, D.M. contends the case should be remanded to determine whether DHS's consent was unreasonably withheld.

## Analysis

### I. Petition for Adoption

#### A. Standing, generally

Standing relates to the capacity of an individual to pursue a particular legal action, and requires the petitioning litigant be adversely affected, or aggrieved, in some way. *See Trust Under Will of Ashton*, 260 A.3d 81, 88 (Pa. 2021), *citing Wm. Penn Parking Garage v. City of Pittsburgh*, 346 A.2d 269, 280 (Pa. 1975) ("person who is not adversely affected in any way by the matter he seeks to challenge is not 'aggrieved' thereby and has no standing to obtain a judicial resolution"). Traditionally, this requirement is met where an individual demonstrates he or she has "a substantial interest in the subject matter of the litigation that must be direct and immediate, rather than remote, and which distinguishes his interest from the common interest of other citizens." *In re Adoption of J.E.F.*, 902 A.2d 402, 412 (Pa. 2006). In Pennsylvania, the doctrine of standing is a judicially-created tool intended to "winnow out" litigants with no direct interest in the matter, and to otherwise protect against improper parties. *In re Hickson*, 821 A.2d 1238, 1243 (Pa. 2003). Consequently, where the General Assembly expressly prescribes the parties who may pursue a particular course of action in Pennsylvania courts, legislative enactments may further enlarge or distill these judicially-applied principles. *See Hous. Auth. of Cnty. of Chester v. Pa. State Civ. Serv. Comm'n*, 730 A.2d 935, 941 (Pa. 1999) (properly-enacted

statute may enhance or diminish the scope of a party's authority to proceed); *see, e.g., Ken R. ex rel. C.R. v. Arthur Z.*, 682 A.2d 1267, 1270-71 (Pa. 1996) (former custody statute provision authorized action to assure contact between parent and child, not child and sibling, who lacked standing to pursue petition for visitation); *In re C.L.P.*, 126 A.3d 985, 988 n.4, 990-91 (Pa. Super. 2015) (grandparents lacked standing under Juvenile Act to intervene in dependency matter, but custody statute authorized grandparents standing to pursue custody of grandchildren who were adjudicated dependent). Standing is a threshold issue and must be resolved before proceeding to the merits of the underlying action. *C.G. v. J.H.*, 193 A.3d at 898. As is the case in custody matters, standing within an adoption proceeding "is a conceptually distinct legal question" from the central, substantive issue of the child's best interests. *Id.*

## B. The rule applied in this case

The decisions below, and the parties' arguments, are framed by their conception of a rule, derived from the Superior Court's expressions in *Adoption of A.M.T.*, 803 A.2d at 208 n.4., and *In re N.S.*, 845 A.2d at 886-87, which precludes standing to intervene in an adoption proceeding for a child in the custody of an agency unless one of the following criteria is met: (1) the legislature has specifically conferred standing for a third party, which DHS urges is limited to current caregivers and certain biological family members anticipated under Sections 2531(a) and (c) of the Adoption Act; (2) the prospective adoptive parent seeking to intervene has obtained the consent of the agency to adopt pursuant to Section 2711(a)(5); or (3) the intervenor **currently** stands *in loco parentis* to the child. *See* Juvenile Court Op., 3/24/2021, at 5-6; *see also* 23 Pa.C.S. §§2531(a), (c), 2711(a)(5).

Preliminarily, we observe there exists no pronouncement of this Court endorsing such a rule, or any of these criteria, as prerequisite to a non-foster-parent, third party's

demonstration of standing to intervene in an action to adopt a child in the custody of an agency. We nevertheless consider the principles underlying the forwarded rule in order to determine whether the lower courts erred in applying it here.

### 1. Superior Court precedent

Twenty years ago in *Adoption of A.M.T.*, a panel of the Superior Court applied *Hess* to hold the refusal of otherwise-required consent from the children's guardian, who was a maternal aunt, did not defeat the standing of a paternal aunt and uncle to intervene in an adoption matter commenced by the maternal family. *See* 803 A.2d at 209. In so doing, the *A.M.T.* panel broke with what it deemed to be a trend of panel decisions confining *Hess* to cases involving only grandparents' petitions to adopt. *See id.* at 207-08. Recognizing its holding might be viewed as a departure from precedent, the panel supplied a footnote stating, "the general rule remains that, to have standing to file a petition for adoption, a third party must either establish that he or she acts **currently** *in loco parentis* to the prospective adoptee or has obtained the written consent from the guardian of the adoptee." *Id.* at 208 n.4 (emphasis added). Although *A.M.T.* cited several prior intermediate appellate decisions as support, the particular origin of this "general rule" restricting standing to a "currentness" requirement is not apparent.[14] Nevertheless, though it would not bind this Court in any event, the *A.M.T.* panel's statement was not essential to the decision's otherwise consistent holding and is thus *dicta* that we decline to recognize as the source of any requirement that *in loco parentis* status must be current to establish standing.

Subsequently, the Superior Court addressed a former foster parent's petitions for both adoption and visitation in *In re N.S.* 845 A.2d at 886-87. Although co-appellees rely

---

[14] Curiously, although DHS relied on *A.M.T.* as the authority to support its successful argument to the juvenile court that *in loco* status must be "not previous, but current," DHS does not repeat that argument here.

on *In re N.S.* (and other cases denying standing to former foster parents) for their position a lapse in caregiving results in the loss of *in loco parentis* status, starkly different considerations apply in such cases as a result of a foster parent's unique duties and agency relationships within the foster system. *See Chester Cnty. Child. & Youth Servs. v. Cunningham*, 636 A.2d 1157, 1158-59 (Pa. Super. 1994) (nature of the limited relationship of the foster parents to the children precludes standing to adopt absent agency consent), *aff'd*, 656 A.2d 1346, 1350 (Pa. 1995) (plurality) (Opinion in Support of Affirmance) ("status of foster parents is subordinate to that of the agency"); *see also Wims*, 685 A.2d at 1037 (former **foster parents** who did not contest child's removal from their care and did not file intention to adopt until five months after the removal lost what *in loco parentis* standing they formerly had to pursue adoption). Notwithstanding this factual distinction, the *In re N.S.* panel's brief analysis actually articulated two separate rules: one regarding standing in adoption matters, which adopted verbatim the *dicta* in *A.M.T.* described above, and the other invoking this Court's decision in *T.B. v. L.R.M.*, a **custody** case, regarding visitation under the **custody** act, according to which "standing for a third party can exist only where the legislature has specifically conferred it or where the party stands *in loco parentis* to the child." *In re N.S.* at 886-87*, citing A.M.T.*, 803 A.2d at 208 n.4; *T.B. v. L.R.M.*, 786 A.2d at 916. Combining the two separate principles, however, the juvenile court below set forth the latter statement, regarding custody, as a rule applicable to this, an adoption case. *See* Juvenile Court Op., 3/24/2021, at 4 ("For a third party to pursue adoption or visitation, the party must have standing, which can only exist 'where [the] legislature has specifically conferred it or where the party stands in loco parentis to the child'."), *quoting In re N.S.*, 845 A.2d at 886-87.

    2. *Application of statutes*

        (a) Custody

Where a statute prescribes the parties to an action, those individuals have standing in the action, and in custody and visitation matters, we have articulated the custody statute's express provisions listing the "individuals who may file an action" for different types of custody — as well as its prior versions providing only for awards "to either parent" and "when grandparents may petition" — demonstrate the legislature's intent to include a narrow scope of litigants in these, typically private, family disputes. 23 Pa.C.S. §§5324-5325; *see*, *e.g.*, *Ken R.*, 682 A.2d 1267; *C.G. v. J.H.*, 193 A.3d at 892-93. We recognize there is a particularly stringent test for standing in third-party suits in custody, which plays a dual role, both to winnow out improper actions, and to prevent intrusion into fundamental parental rights and privacy interests "by those who are merely strangers[.]" *J.A.L.*, 682 A.2d at 1319. As we observed in *T.B. v. L.R.M.* — a case decided a decade before the General Assembly included persons standing *in loco parentis* in the custody statute's standing provision — "courts generally find standing **in third-party visitation and custody cases only where the legislature specifically authorizes** the cause of action[;]" and yet, even absent a statutory underpinning at the time, a third party could maintain an action for custody "where that party stands *in loco parentis* to the child." *T.B. v. L.R.M.*, 786 A.2d at 916 (emphasis added; citations and quotations omitted); *see* Act of Nov. 2010, P.L. 1106, No. 112 at §§5324-5325. Accordingly, courts must reinforce the express statutory limitations to standing in private **custody** actions, albeit not so rigidly or absolutely as to deny one acting *in loco parentis* an opportunity to be heard, and not without regard for traditional standing principles. *T.B. v. L.R.M.*, 786 A.2d at 919-20 ("A determination of standing simply implies that the party has a substantial interest in the subject matter of the litigation and that the interest is direct, immediate and not a remote consequence."); *see also C.G. v. J.H.*, 193 A.3d at 898 (prior version of custody act's standing provision "limits the classes of persons deemed to have a substantial, direct,

and immediate interest in the custody of children by conferring standing only upon [a parent, grandparent, and person who stands *in loco parentis* to the child] under certain circumstances); *Ken R.*, 682 A.2d at 1271 ("the legislature has allowed court interference with the **parents' right to custody** only in rare and exceptional circumstances") (emphasis added); *J.A.L. v. E.P.H.,* 682 A.2d at 1320 ("[I]t is important to view the standard in light of the purpose of standing principles generally: to ensure that actions are brought only by those with a genuine, substantial interest" rather than "a rigid rule[.]").

(b)  Adoption

Unlike the custody statute's explicit standing prerequisites, the Adoption Act, under Subchapter B, titled "Parties," and Section 2312, titled "Who may adopt," provides, "Any individual may become an adopting parent."  23 Pa.C.S. §2312; *see Hess*, 608 A.2d at 13; *Adoption of J.E.F.*, 902 A.2d at 409.

Notwithstanding this more open-ended approach, the Act does, in other provisions, impose exacting substantive and procedural requirements regarding the official record necessary to support a decree in both private adoptions and those involving children in foster care.  These include, *inter alia*: who may petition for termination of parental rights; which reports, home studies, background checks, and other investigations are necessary; whose consents are required and when they may be excused; strict pleading, exhibit, and hearing requirements; the court's directive in evaluating the petition; and the effects of the decree.  *See* 23 Pa.C.S. §§2501-2938.  The adoption court has discretionary authority to dispense with certain, otherwise necessary consents — including the guardian's, but not those of children over age twelve, *see id.* §2711(a)(1) & (5), §2713; it may order further investigation at any time, *see id.* §2724(b); and the entry of a final decree is predicated on the court's satisfaction that the child's needs and welfare, and all other requirements of the Act, are met by the adoption, *see id.* §§2901, 2902(a).

In addition to the procedural role each statutory provision plays in advancing an adoption petition toward permanency, they serve the critical broadscale function of scrutinizing the safety, wellbeing, and viability of the resulting court-sanctioned, permanent parental relationship at each step along the way, necessarily limiting a petitioner's eligibility to finalize an adoption. *See J.E.F.*, 902 A.2d at 412 ("'At all stages of the proceedings, the best interest of the child is the paramount consideration.'"), *quoting Hess*, 608 A.2d at 13, *citing* 23 Pa.C.S. §2902(a). It does not follow, however, that the General Assembly intended for these quasi-substantive procedures to limit a petitioner's eligibility to be heard and attempt to demonstrate a genuine and substantial interest in providing permanency for a child. We might find greater support for co-appellees' position these requirements should be extrapolated into an exclusive class of people who may file for adoption, if the Act's declaration of "who may adopt" included any further qualification. However, the General Assembly did not circumscribe the action to "any individual who meets the requirements under this Act." The antecedent for each qualification and requirement of the adoption proceeding is the statutory premise that "**[a]ny individual** may become an adopting parent." 23 Pa.C.S. §2312 (emphasis added). And, on the occasions we have addressed the issue of standing in adoption matters involving non-foster parents, we have invoked traditional notions of standing to examine want of a substantial legal interest in an adoption matter. *J.E.F.*, 902 A.2d at 411; *see Hess*, 608 A.2d at 13.

In *Hess*, where grandparents sought to intervene in an adoption, and in *J.E.F.*, regarding adoption petitions of an aunt and uncle, we rejected an agency's contention its consent, required under Section 2711(a)(5) of the Act, was necessary to confer standing to the children's relatives who sought to intervene. *See Hess*, 608 A.2d at 12-13; *J.E.F.*, 902 A.2d at 404-05. As a result of the broad discretionary authority conferred to the

adoption court by Section 2713 to dispense with certain consents in the critical context of the child's best interests, and the Act's predication of a decree on a multitude of other requirements subject to the court's satisfaction, we squarely rejected any purported relationship between the threshold issue of a party's standing, and the substantive impact of the Act's consent requirements. *J.E.F.*, 902 A.2d at 404-05, 416; *see Hess*, 608 A.2d at 13 ("[W]e must be guided by the specifications of the Adoption Act in making our determination."); *see also* 23 Pa.C.S. §§2711(c)(5), 2713. We also rejected the agency's view that the "unique status" of grandparents meant *Hess* applied to those relationships only, such that an agency's refusal of the consent to adopt required by Section 2711 could still bar standing for everyone else. *See id.* at 404-05. Instead, with respect to the Section 2711 consent requirements, the *J.E.F.* Court unanimously declared "this provision, by its plain language, never purports to speak to standing, much less does the provision suggest that the consequence of withholding consent is to eliminate standing."[15] *J.E.F.*,

---

[15] Section 2713 "leaves it to the court to decide the relevance and importance of a conferred, or a withheld, consent from a relevant party." *J.E.F.*, 902 at 411-12, 415, 417. Even where the agency's refusal to consent is examined by the court and deemed reasonable, it does not deprive a party of standing, or bear on standing in any way, but relates to the merits of the petition, which requires the verified pleading of certain consents or the "basis upon which such consents are not required," 23 Pa.C.S. §2701(7), and the petitioner may seek leave of court to dispense with those consents within its discretionary authority. *Id.* at 416-17 ("Nothing in the plain language of Section 2713(2)'s conferral of broad discretionary power upon the court requires it to deem a custodial agency's 'reasonable' refusal to consent to be conclusive of anything, much less the preliminary question of standing. . . . [T]he Act does not contemplate that a failure to consent should have that effect."). In urging us to consider the juvenile court decision lacked a specific finding that its consent was unreasonably withheld, DHS raises the identical argument as the agency in *J.E.F.*, which is baseless. *See id.* at 415 ("Section 2713(2) made clear that, in the exercise of its duty to determine what was in the child's best interests, 'the court has the final burden of determining whose consent is necessary' and '[t]he agency's implicit assertion that its opinion will somehow control the outcome of the adoption is therefore baseless.'") (quoting *Hess*, 608 A.2d at 14); *id.* at 409, 416-17. We urge the parties, and the adoption court on remand, to carefully review our decision in *J.E.F.*

902 A.2d at 411; *see id.* at 412, 416 (agency's refusal to consent does not "deprive a person who otherwise has a stake in the litigation standing to pursue that interest"). Instead, the Act contemplates the adoption court, not the agency, will perform an analysis of a conferred or withheld consent of a relevant party as part of "an overall substantive evaluation" of the child's best interests in the merits of proceeding on an adoption petition, and this **substantive** inquiry necessarily follows, but has no relation to, the **preliminary** inquiry into standing. *Id.* at 412, 416. We reiterate: the agency's withheld consent is not a bar to standing and has no part in that analysis; rather, it is an issue to be considered subsequently and substantively within the paramount context of the child's best interests, her individual needs and welfare, in relation to the petition.[16]

In both *Hess* and *J.E.F.,* we also considered the role of Section 2531 of the Act, regarding reports of intention to adopt, in this analysis. *See* 23 Pa.C.S. §2531. In addition to listing the required content of the report, the section dictates who is required to file a report and where, *i.e.*, the child's current custodial caregivers, in the court where the adoption petition is filed, *see* §2531(a), and who is not, *i.e.*, a parent, grandparent, stepparent, brother, sister, aunt or uncle, *see* §2531(c). In *Hess*, we said Section 2531(c) "illustrates the expectation," without presumption or preference, these permanent relationships might engender a legal interest in adopting a relative. *Hess*, 608 A.2d at 13.

---

[16] *J.E.F.* did not address an adoption in which the child's consents were necessary. *See J.E.F.*, 902 A.2d at 411-12. In this case, the child turned twelve years old while this matter was pending; the parties agree her consent is now required under Section 2711(a)(1), and does not fall within the court's discretionary authority under Section 2713. *See* 23 Pa.C.S. §§2711(a)(1), 2713. The child advocate urges that we not require the child to consider the proposition. However, the issue of whether the child's required consent (whether withheld or conferred) should impact standing to intervene in an adoption is not our decision to make at this juncture, but for the adoption court on remand. While the force of authority suggests all issues of consent in this context are substantive in relation to the child's best interests, we are confident in the juvenile court's ability to curate appropriate parameters for addressing complex issues with vulnerable children, if and when they become warranted.

Similarly, in *J.E.F.*, the provision underscored such familial relationships may inhere a substantial, direct, and immediate interest which surpasses the interests of ordinary strangers. *J.E.F.*, 902 A.2d at 414, 416. DHS's bald assertion this provision exclusively enumerates the whole class of individuals who may adopt, and therefore limits standing to those individuals, is unpersuasive here. Foremost, like consents under Section 2711, this provision, on its face, "never purports to speak to standing." *Id.* at 411. Section 2531 does not provide parameters for anyone "who may" do anything, but rather mandates what all pre-adoptive parents currently caring for children "shall" do — *i.e.*, report their intent to adopt, unless excused by an excepted familial relation. This contrasts significantly with Section 2312, which relates to "parties" in an adoption proceeding and expressly provides "who may adopt" — *i.e.*, "any individual." 23 Pa.C.S. §§2312, 2531(a), (c). Thus, as with the Act's consent requirements under Section 2711, we do not view Section 2531 to place a limit on standing. Instead, the provision illustrates certain relationships are expected to have permanency, by familial relation or formal declaration, which facially demonstrate a substantial, durational interest in the child.

Accordingly, "nothing in the Act precludes any party from filing a petition for adoption, nor is there anything to preclude the trial court from entertaining multiple adoption petitions and then determining the best interests of the child." *J.E.F.*, 902 A.2d at 416. Though we recognize a more stringent test necessarily applies in private custody matters due to the "'traditionally strong right of parents to raise their children as they see fit[,]' . . . [t]here is no suggestion that a more stringent test for standing should apply in adoption matters, based upon the inherent nature of the action" where no such parental rights continue to exist. *Id.* at 412-13 & n.10, *quoting T.B. v. L.R.M.*, 786 A.2d at 916. In these latter situations, the appropriate parameters of standing are not drawn from the statute's provisions, but from traditional jurisprudential standing principles. *See id.* at 413,

415-17 ("[U]nder both the Act and traditional notions of standing, it is not the consent of the [a]gency that determines the preliminary question of standing to be heard under the Adoption Act, but the existence of a substantial, direct, and immediate interest in the proceeding. . . . We do not doubt that traditional standing principles would warrant a denial of standing to a party in an adoption matter, no less than in other cases, where such an interest was lacking."). Moreover, the petitioning party must still meet the requirements of the Act, and "standing does not mean that they will, or should" prevail in subsequent merits determinations, *i.e.*, substantive evaluations of the child's best interests. *Id.* at 416, 418.

Thus, one who seeks to adopt a child in the custody of an agency must demonstrate a substantial, direct, and immediate interest in the subject matter of the litigation — that is, a "genuine, and not merely a theoretical," interest in assuming the role of a permanent parent who best meets the child's needs and welfare — which surpasses such an interest of ordinary, unrelated strangers. *J.A.L. v. E.P.H.*, 682 A.2d at 1318; *see J.E.F.*, 902 A.2d at 414. The Adoption Act, through its Sections 2531 and 2711 (and potentially other provisions[17]) supplies certain criteria which, if established, carry with them an expectation of permanency — sufficient in most, if not all, instances to demonstrate a genuine and substantial interest on the face of an adoption petition. There may be other circumstances giving rise to this interest, and we do not foreclose the opportunity for a petitioner in such an instance to be heard in the substantive matter of the child's best interests.

We proceed to examine whether the *in loco parentis* relationship asserted by appellant presents one such opportunity.

---

[17] *See, e.g.*, 23 Pa.C.S. §2512(a)(3) (authorizing standing to file a petition for involuntary termination of parental rights by "[t]he individual having custody or standing in loco parentis to the child and who has filed a report of intention to adopt").

II. Appellant's Motion to Intervene

A. Intervention

A nonparty who seeks to intervene in an adoption matter must establish a "recognized legal interest" — one that is enforceable through, or affected by, the adoption proceedings — whether or not the moving party would ultimately be bound by the adoption decree. *Hess*, 608 A.2d at 12; Pa.R.Civ.P. 2327. [18]

In *Hess*, the Court found such a legally enforceable interest under the custody statute's provisions, both allowing grandparents to seek custody and visitation under certain circumstances, and terminating any rights conferred thereunder if and when the child is adopted. *See Hess*, 608 A.2d at 12-13, *citing* 23 §§5313, 5314 (repealed). Regardless of whether the grandparents could actually have prevailed under the custody law (and the Court determined they could not), absent any other statutory provision to the contrary, the *Hess* Court considered this to mean grandparents could foreseeably

---

[18] Justice Donohue states the "relevant intervention factor" in *Hess* was Pa.R.Civ.P 2327(3), which provides, "[a]t any time during the pendency of an action, a person not a party thereto shall be permitted to intervene therein" if "such person could have joined as an original party in the action or could have been joined therein." Concurring Opinion at 2 n.2, *citing Hess*, 608 A.2d at 12. Although the application of this particular mechanism was not made clear in *Hess*, the Court further developed its reasoning consistent with Rule 2723(4) and the concept it reinforces, which allows intervention where the result "may affect any legally enforceable interest" of the proposed intervenor that is not otherwise protected by another party to the litigation, "whether or not such person may be bound by a judgment in the action." Pa.R.Civ.P. 2723(4); *Hess*, 608 A.2d at 13-15; *see also Bily v. Bd. of Prop. Assm't of Allegheny Cty*, 44 A.2d 250, 251 (Pa. 1945) ("The right of intervention should be accorded to any one . . . provided that his rights will be substantially affected by the direct legal operation and effect of the decision, and provided also that it is reasonably necessary for him to safeguard an interest of his own which no other party on the record is interested in protecting."). We note the Rules are procedural in nature, and do not abrogate or otherwise change a party's substantive right to intervene under certain circumstances. *See In re Templeton*, 159 A.2d 725, 729 (Pa. 1960) (procedural rules "not to be exalted to the status of substantive objectives") (internal quotes and citations omitted).

continue to seek enforcement of custodial rights **after** parents' rights have been terminated, up until the entry of an adoption decree. *See id.*; *see also A.M.T.*, 803 A.2d at 206-08. And because the Adoption Act identified grandparents as relatives excused from filing a report of their intent to adopt under Section 2531(c), the Act anticipated grandparents might be expected to adopt, and thus had a legal interest that would be affected by, or could be enforced through, intervention in the adoption proceedings. *See id.*

The custody statute has been updated several times since *Hess* was decided. Though grandparents' rights remain conditioned on certain circumstances, the statute now provides, without condition, a "person who stands in loco parentis to the child" may file an action "for any form of physical custody or legal custody[,]" and, this right "shall be automatically terminated upon [an] adoption." 23 Pa.C.S. §§5324(1), 5326. As well, the Adoption Act anticipates individuals who become custodial caregivers of children through an *in loco parentis* relationship might pursue adoption: Section 2512 of the Act affords "the individual having custody or standing in loco parentis to the child" with standing to pursue involuntary termination of the parents' rights, and thereby propel the adoption process forward, if he or she "has filed a report of intention to adopt required by section 2531[.]" 23 Pa.C.S. §2512(a)(3).[19] Consistent with our analysis *supra*, we do not interpret Section 2512 (standing to terminate parental rights) as a delimiter on standing to petition for adoption, and the extant custody statute further makes clear, if appellant ever had any right to assert *in loco parentis* standing in a custody matter, it would be extinguished upon

---

[19] Whether the Adoption Act, by virtue of Section 2512, can be read to unequivocally anticipate adoption by caregivers who **previously** stood *in loco parentis* to the child is beyond our reach in this case — the parties have not discussed the role of this provision, and unlike Section 5324 of the custody statute, Section 2512 of the Adoption Act additionally conditions *in loco parentis* standing on a formal declaration of intent to adopt, which would facially demonstrate standing to adopt in any event. *Compare* 23 Pa.C.S. §2512(a)(3) *with id.* §5324(1).

entry of an adoption decree. *See* 23 Pa.C.S. §5326; *see also E.T.S. v. S.L.H.*, 54 A.3d 880 (Pa. Super. 2012) (under §5326, former live-in romantic partner of children's custodial aunt lost *in loco parentis* right to seek custody of children when aunt adopted the children). Thus, consistent with our analysis in *Hess*, if appellant establishes an *in loco parentis* status, he establishes an interest sufficient to intervene. *Accord Hess*, 608 A.2d at 12-13; *A.M.T.*, 803 A.2d at 206-08.

We turn our review to the common law doctrine of *in loco parentis*.

### B. Standing *In Loco Parentis*

*In loco parentis* is a legal status, and proof of essential facts is required to support a conclusion that such a relationship exists. *T.B. v. L.R.M.*, 786 A.2d at 916, *citing Kransky v. Glen Alden Coal Co.*, 47 A.2d 645, 646 (Pa. 1946). "The phrase '*in loco parentis*' refers to a person who puts oneself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption." *Id.* Long before our custody statute granted standing based upon the status, *in loco parentis* was recognized as the sole common law exception to the rule restricting custody and visitation actions to the legal parents and grandparents expressly authorized by statute. *See id.* Our child custody jurisprudence provides much of the context for the doctrine, and though adaptable, warrants due consideration of the circumstances in which different types of cases arise; unlike custody disputes between arguably fit parents, agency-initiated adoption matters involve especially vulnerable children in the custody of an entity, and the rights of their natural parents no longer exist.

The foundational elements of *in loco parentis* status, upon which all other considerations may rise or fall, include the assumption of a parental role, and the discharge of parental duties. *See C.G. v. J.H.*, 193 A.3d at 907-08, 910; *T.B. v. L.R.M.*, 786 A.2d at 916-17, 919-20. The assumption of a parental role must originate with a legal

parent's assent, whether through encouragement or acquiescence. *See C.G. v. J.H.*, 193 A.3d at 907-08, *quoting T.B. v. L.R.M.*, 786 A.2d at 907 (a third party in this type of relationship cannot "place himself *in loco parentis* in defiance of the parents' wishes and the parent/child relationship"). In cases where natural parents have relinquished care or are otherwise absent, the Superior Court has articulated a slightly more flexible iteration of this principle: although potentially in defiance of a parent's wishes, an assumption of parental duties may be achieved through "some legally cognizable," *i.e.*, non-illicit means. *See, e.g., In re C.M.S.*, 884 A.2d 1284, 1288-89 (Pa. Super. 2005), *appeal denied*, 897 A.2d 1183 (Pa. 2006). Furthermore, contrary to the present position of DHS, any purported "defiance" of a parent's wishes — as it relates to a third party's *in loco parentis* status — corresponds to the formation of the parent-child relationship with the third party, not its continuation. *See, e.g., A.J.B. v. A.G.B.*, 180 A.3d 1263, 1277-79 (Pa. Super. 2018) (biological custodial parent could not, in hindsight, expunge ex-spouse, nonbiological parent's relationship with child once paternity was known; although "*in loco parentis* status cannot be in defiance of the natural parents' wishes and the parent-child relationship . . . such defiance must have been to the creation of a parent-child bond with the third party, rather than to the continuation of the relationship"), *appeal denied*, 196 A.3d 1016 (Pa. 2018). Rather, "the relevant time frame to determine whether a party stands in loco parentis is when the party developed the relationship with the child with the acquiescence or encouragement of the natural parent." *C.G. v. J.H.*, 193 A.3d at 910.

In child custody disputes raising challenges to *in loco* status — most often involving a natural parent and a nonbiological former spouse or partner — courts examine the parties' conduct for objective evidence of an assumed parental role and duties. One of the most obvious demonstrations of an *in loco parentis* relationship is where the natural parent and third party lived together with child as a "family unit" while co-parenting the

child. *See T.B. v. L.R.M.*, 786 A.2d at 919. This is not a restrictive rubric, and family is an evolving concept. *See C.G. v. J.H.*, 193 A.3d at 912-13 (Dougherty, J., concurring). The nature of the relationship between a natural parent and third party **to each other** "has no legal significance to the determination of whether [the third party] stands *in loco parentis* to [the child]." *T.B. v. L.R.M.*, 786 A.2d at 918-19 ("The ability to marry the biological parent and the ability to adopt the subject child have never been and are not now factors in determining whether the third party assumed a parental status and discharged parental duties."). What is significant, though, is the third party's relationship **to the child**, and how that relationship was forged, *i.e.*, through assented assumption of a position more significant to the child than a frequent caretaker. *See id.*; *see also In re C.B.*, 861 A.2d 287, 296 (Pa. Super. 2004) (important aspect of *in loco parentis* doctrine is whether the third party lived with the child in a family setting "irrespective of its traditional or nontraditional composition").

In *J.A.L. v. E.P.H.*, the seminal Superior Court decision reached in 1996, several years prior to statutory incorporation of *in loco parentis* status in custody actions and pronouncements of the rights of same-sex couples to marry and adopt, the court considered the significance of the strong psychological bonds infants form with the caregivers who live with them during early childhood, even if they were not the child's primary caregivers. *See* 682 A.2d at 1320. The court observed that, with respect to the nonbiological parent's standing, the presumption against third parties in custody disputes (in favor of the biological family's privacy and autonomy):

> must give way where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent. Where such a relationship is shown, our courts recognize that the child's best interest requires that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained even over a natural parent's objections.

*Id.* Accordingly, the *J.A.L.* court held, where the nonbiological parent lived with the child for the first ten months of its life and acted as a parenting partner to the child's mother, the opportunity for bonding to occur was established, and the young child's recognition of the nonbiological parent as a significant person in her life demonstrated "a constant, sincere interest in the child" sufficient to confer *in loco parentis* status. *Id.* at 1322.

We have also recognized, however, not all strong psychological bonds are positive ones. *See*, *e.g.*, *In re T.S.M.*, 71 A.3d 251, 271 (Pa. 2013) (children's needs and welfare necessitated termination of parental rights despite strong but damaging bonds). More recently, in *C.G. v. J.H.*, we addressed the legal significance of a bond in the context of an *in loco parentis* relationship, and concluded its consideration for the purpose of a standing analysis must be secondary to, and result from, a demonstrated assumption of a parental role and discharge of parental duties. *See* 193 A.3d at 909-10 (bonding evaluation not required where evidence did not demonstrate assumption and discharge of parental duties). In this regard, the import of the *J.A.L.* decision is not to introduce an examination of bonding into a standing inquiry, but rather to recognize a bond exists with a nonbiological caregiver just as with the natural parent where the caregiving role is assumed during a child's infancy and early childhood; that is, where one "has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent" since the child's birth, the primacy of the resulting bond warrants a *prima facie* right to *in loco parentis* status to be heard regarding the substance of the child's best interests. *J.A.L. v. E.P.H.*, 682 A.2d at 1319-22.

In a similar fashion, consideration of the parties' post-separation conduct in custody matters is also secondary to the demonstration of an assumed parental role and discharge of parental duties, relevant insofar as it sheds light on whether the person seeking standing was ever viewed as a parental figure. *See C.G. v. J.H.*, 193 A.3d at

910-11. Although rendering all post-separation conduct irrelevant in such standing disputes would, in some circumstances, ignore the purposeful withholding of access to the child by the legally-recognized parent, in other circumstances it could afford third parties a greater advantage than a natural or adoptive parent who had otherwise demonstrated a relinquishment of parental claims to a child. *Id.* at 910-11 & n.17; *see id.* at 917-18 (Wecht, J. concurring) ("If there is evidence that the third party has assumed parental status and discharged parental duties during the relationship, and if there is evidence that the custodial parent purposefully withheld the child, then post-separation conduct should not be considered for purposes of denying standing to the third party. This Court should not countenance even the suggestion that a parent unilaterally can erase from a child's life a third party who, in all material respects, acted as a parent.").

Notably, a substantial body of Superior Court jurisprudence clearly recognizes "third parties who are not designated foster parents may seek adoption when they can establish that they stand *in loco parentis* to the child." *Cunningham*, 636 A.2d at 1159, *aff'd*, 656 A.2d at 1349, *citing In re Adoption of J.M.E.*, 610 A.2d 995 (Pa. Super. 1992) (couple who raised child for four years since infancy had standing to file termination action based on *in loco parentis* status, despite lack of legal custody), *appeal denied*, 618 A.2d 402 (Pa. 1992). These cases dovetail with one prominent aspect of decisions regarding foster-parent standing: they articulate a critical distinction between prospective-adoptive foster parents, with whom all parties expect the relationship to be permanent from its inception — so the prospective-adoptive foster parents have *in loco parentis* status — and all other foster parents, whose relationship to the child all parties expect to be temporary and subordinate to the agency's reunification efforts — and who typically do not have *in loco parentis* status. *See Mitch v. Bucks Cnty. Child. & Youth Social Serv. Agency*, 556 A.2d 419, 422-23 (Pa. Super. 1989) ("Because prospective adoptive

parents, unlike foster parents, suffer a direct and substantial injury when an agency removes a child from them, we see no reason in law or policy why we should limit their standing to sue[.]"), *appeals denied*, 571 A.2d 383, 384 (Pa. 1989). In this vein, third parties who are not foster parents may likewise acquire *in loco parentis* status when they accept responsibility to care for a child in a parental role and the expectation of all parties involved is that the relationship forged will be a permanent one. *See In re B.L.J.*, *Jr.*, 938 A.2d. 1068, 1073-74 (Pa. Super. 2007) (where terminally-ill grandmother who stood *in loco parentis* of five-year-old child found and placed child with adoptive family before she died, grandmother and adoptive parents had expectation of permanency, and adoptive parents stood *in loco parentis* in the termination proceeding); *Adoption of J.M.E.*, 610 A.2d at 998 (where infant's aunt, who was his legal guardian, gave care of child to married caregivers to raise "until he's grown," caregivers had expectation of permanency and stood *in loco parentis* to pursue termination of parental rights and adoption); 23 Pa.C.S. §2512(a)(3). Consequently, although the examination of *in loco parentis* standing to initiate a termination of parental rights proceeding under Section 2512 is necessarily narrower than standing to pursue an adoption, we conclude the expectation of permanency during the period a third party legitimately assumed a parental role is nonetheless an important consideration for authenticating an *in loco parentis* relationship.

Moreover, when a would-be party's *in loco parentis* status is challenged, the inquiry is necessarily fact-intensive and case-specific. *C.G. v J.H.,* 193 A.3d at 911. Where the status is established, however, "[t]he rights and liabilities arising out of an *in loco parentis* relationship are, as the words imply, **exactly the same as between parent and child**." *Id.* at 907 (emphasis added), *quoting T.B. v. L.R.M.*, 786 A.2d at 917; *Peters*, 891 A.2d at 710 (same); *see id.* at 910.

With these considerations in mind, we return to the record before us.

## C. The Present Appeal

We accepted review to determine whether the juvenile court erred when it denied appellant standing — based on *in loco parentis* status — to intervene in the adoption of the child. Applying the foregoing analysis to the present appeal, we conclude the juvenile court did err. The court interpreted and applied relevant Adoption Act provisions strictly, as principles of limitation on standing in an adoption action, in contravention of 23 Pa.C.S. §2312, *J.E.F.*, and *Hess*, rather than assessing whether appellant demonstrated a genuine and substantial interest in having a formal, permanent parental role in the child's life as a result of the *in loco parentis* status he pleaded. Appellant's motion to intervene warranted an examination of whether he assumed a parental role legitimately, whether parental duties were discharged during the relevant time, and whether there was an expectation of permanency in the relationship, or at least "a constant, sincere interest in the child," sufficient to authenticate *in loco parentis* status. *J.A.L. v. E.P.H.*, 682 A.2d at 1322.

To the extent the juvenile court's assessment can be read as a "totality of the circumstances" application of these principles, we review whether, as co-appellees contend, the record in this case supports such a conclusion. Initially, co-appellees' assertion appellant "never" assumed any parental duties or obligations is undermined by the juvenile court's express factual finding that "[a]fter Child's birth, Child was in the care of [T].B.'s mother and [T].B. for approximately five years." Juvenile Court Op., 3/24/2021, at 2. Insofar as co-appellees assert the juvenile court assessed appellant's testimony and determined it to be not credible, our review reveals the court neither granted DHS's request for an adverse credibility finding, nor considered credibility to be dispositive. Regarding the court's statement from the bench that "it wasn't credibility that was the overwhelming decision," N.T. at 46, in its ensuing opinion pursuant to the underlying

appeal, the court noted only a purported discrepancy in appellant's testimony regarding "juvenile charges." Juvenile Court Op., 3/24/2021, at 2, *citing* N.T. at 23, 25; *see supra* n.9. According to the transcript, appellant initially referred to the charges as "past juvenile charges that I was certified for" and subsequently stated several times these were not "juvenile charges" but were certified as adult charges when he was a minor, and he also obtained other charges as an adult. N.T. at 23-25; *see id.* at 26-29, 34-35. Also salient in this regard is the court's citation to appellant's testimony — to which there were no objections or rebuttal evidence provided — as the only evidentiary basis for each and every one of its factual findings. *See* Juvenile Court Op., 3/24/2021, at 2, 5-6. To the extent the purported discrepancy identified by the juvenile court could be construed as the basis of an adverse credibility determination, no discrepancy is evident, and no other basis for such an inference is supported by the record.[20]

---

[20] Similarly, co-appellees stretch the absence of evidence in the record to fault appellant's purported failure to intervene in the underlying dependency matter, while simultaneously validating the juvenile court's contrary finding appellant was not named as a party in the dependency case because he lacked a biological or legal relationship to the child. The Juvenile Act provides no clear definition of who is or is not a party, while its proceedings are generally closed to nonparties. *See In re L.J.,* 691 A.2d 520, 526 (Pa. Super. 1997) ("[T]he fact patterns of dependency cases are too variable to permit us to establish one definition [of 'party'] that would be appropriate for all cases.") (citation and quotation marks omitted). Intervention is considered voluntary, and, without the benefit of this consideration below, we question the extent to which a person's non-election to intervene, in a case where the allegations of insufficient care of a child were not filed with respect to him, can then be binding on him. *See Bannard v. N.Y. State Nat. Gas Corp.*, 172 A.2d 306, 312 (Pa. 1961) ("A party who may be affected by litigation or who may have an interest therein is not required to intervene and, if he does not, a determination in the action is not binding upon him."). There are substantial safeguards in place to notify, summons, provide legal representation, and otherwise ensure the ability of identifiable legal parents and guardians to participate in dependency proceedings, but it is unclear how someone in appellant's shoes could be charged with the knowledge he could participate in the matter, and had the obligation to do so. Were we to accept such an inference from this record, we could likewise infer DHS did not file a dependency petition with regard to appellant because it did not identify him as one whose caregiving ability was lacking, or, that it failed to make reasonable efforts to reunify the child with the caregiver she recognized as "Dada," or to otherwise prioritize her placement with kin. *See*

Likewise, co-appellees' list of purported duties appellant "never" performed is neither relevant here nor supported by the record; an individual's appearance on a child's birth certificate or acquisition of legal guardianship may be evidentiary in some contexts, but they are by no means dispositive as to a caregiving role, and are formalities which would obviate an *in loco parentis* status in the first instance. In addition, the juvenile court's finding a family unit "never existed" — because the child's otherwise-incarcerated biological mother lived with them for only a brief time — ignores relevant record evidence tending to show appellant interacted with R.B.P. and the child as a family unit, and he may have provided the sort of day-to-day care and decision-making for the child sufficient to demonstrate he assumed a co-parenting role and a discharge of parental duties while living with the child since birth until age five. Co-appellees observe appellant produced no record evidence of a bond or post-separation contact with the child, but as we have explained, such evidence is of little consequence to a standing inquiry, especially where the relevant time period involves the rearing of a small child since birth.

Finally, though we have disposed of the notion *in loco parentis* status for purposes of standing to intervene in an adoption proceeding must be "current" — as in a present caregiving capacity — we are nevertheless faced with the conundrum of appellant's five-year absence, reflecting at least half of the child's life. Appellant concedes an *in loco*

67 Pa.C.S. §§3102, 3103, 3105 (family finding required; "county agency shall give first consideration to placement with relatives or kin" defined as "[a]n individual with a significant, positive relationship with the child or family"); Pa.R.J.C.P. 1149 (court "shall place its determinations on the record as to whether the county agency has reasonably engaged in family finding"). For good reason, we decline to make these inferences. But we observe that whatever pertinent information regarding appellant may have emerged during the course of the dependency proceeding is well within the knowledge and reach of DHS and the child advocate (who chose to cross-examine appellant rather than offer any evidence to the court) and well outside the reach of appellant (who was not a party). To the extent it might serve as a basis to disqualify any interest asserted by appellant, the record lacks both competent evidence and legal support for its inclusion in our analysis.

*parentis* status can be terminated. Co-appellants contend, at bottom, it's simply been too long since appellant has performed a parental duty. DHS, arguing appellant was not entitled to "wait for a more convenient time for himself to seek standing, without regard to the child's needs and welfare," underscores a useful marker, tacitly invoking the Adoption Act's grounds for involuntarily terminating a parent's rights based on parental abandonment of duties. Brief of DHS at 10. *See* 23 Pa.C.S. §2511(a)(1); *Adoption of C.M.*, 255 A.3d at 364 ("Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs."). But we reiterate: the rights and liabilities arising out of an *in loco parentis* relationship are exactly the same as between parent and child. Parental rights, even simply custodial ones, typically do not expire merely by the passage of time; indeed, Section 5236 indicates an *in loco parentis* party's right to pursue custody terminates potentially only upon adoption. 23 Pa.C.S. §5236. Our thinking on this point aligns with the principle that whether a parent's rights should be terminated against their will as a result of abandonment of duties requires due process, notice, an evidentiary hearing, and, substantively, consideration of the reason for the absence; properly exercised, a termination of parental rights is not warranted for circumstances beyond a parent's control such as where a custodial parent prevents access to the child, or the "mere showing" a party "could conceivably have pursued legal action more promptly[.]" *See Adoption of C.M.*, 255 A.3d at 364-65, *quoting Adoption of S.H.*, 383 A.2d 529, 533 (Pa. 1978).

We do not, at this juncture, suggest the full force of a termination of parental rights proceeding is necessary to oppose standing in appellant's case. Nor do we foreclose on any possibilities for resolution of these issues not presently raised. However, the record before us says too little about too much, while co-appellees infer too much about too little;

thus we remand to the adoption court to consider appellant's standing anew in light of the proper standards. Where an assumption of a parental role and discharge of parental duties in the past by appellant is evident, the reasons provided for periods of absence and whether access to the child has been fairly and legitimately withheld by the custodial entity are relevant considerations for examining the authenticity of appellant's expectation or interest in permanency.[21]

**Conclusion**

Accordingly, we hold the juvenile court applied an incorrect analysis of appellant's standing to intervene in an adoption based on his asserted *in loco parentis* status, and therefore misapplied the law. A proper standing inquiry reviews whether a non-foster-parent third party seeking to pursue a petition to adopt a child in the custody of an agency has a genuine and substantial interest in formalizing a permanent parental relationship with the adoptee-child, which surpasses the interest of ordinary, unrelated strangers.

An individual's previously-held *in loco parentis* status may, in a particular circumstance, demonstrate this requisite interest and allow the party to be heard with regard to the substance of an adoption matter wherein the paramount consideration is the child's best interest. In such a case, the individual asserting *in loco parentis* status must demonstrate a legitimately-acquired assumption of the parental role, and a discharge of parental duties. Important to this inquiry in the context of an adoption is whether the *in loco parentis* relationship authenticates an expectation of permanency, or a sincere and firm commitment to performing a non-temporary parental role in the life of

---

[21] These considerations comport with guidelines governing intervention set forth in our Rules of Civil Procedure, which are construed liberally to secure a just resolution, and condition refusal of intervention upon the absence of a reasonable excuse under the particular factual circumstances evident to the trial court. *See* Pa.R.Civ.P. 2329; *Esso Standard Oil Co. v. Taylor*, 159 A.2d 692, 695-97 (Pa. 1960).

the child.  The adoption court's review is not limited to these considerations, but it must, in all cases, determine whether the evidence demonstrates the assumption of a parental role and discharge of parental duties.[22]  In viewing whether a previously-existing *in loco*

---

[22] For the adoption court's consideration on remand, we make two observations.  First, standing is an issue that halts justiciability of an action on its merits; as a consequence, challenges must be raised at the soonest possible opportunity and may be waived if not promptly raised.  *See Erie Indem. Co. v. Coal Operators Cas. Co.*, 272 A.2d 465, 467 (Pa. 1971) (in civil litigation, issue of capacity to sue is waived unless specifically raised in preliminary objection or answer); *In re Est. of Brown*, 30 A.3d 1200, 1204 (Pa. Super. 2011) (on appeal from orphans' court, issue of standing may not be raised *sua sponte*, but may be waived by a party "if not objected to at the earliest possible opportunity").  Generally, a challenge to standing is properly pleaded by way of preliminary objection or similarly-styled pleading.  *See Erie Indem. Co.*, 272 A.2d at 467; *In re Est. of Alexander*, 758 A.2d 182, 189 (Pa. Super. 2000) (in orphans' court matters, "[c]hallenges to a litigant's capacity to sue must be raised by way of preliminary objections or answer").  In fact, every standing decision referenced herein and in the parties' briefs involved an appeal of an order disposing of preliminary objections.  The effects of this procedure are material: under Civil Procedure and Orphans' Court Rules, a default twenty-day period for responsive pleadings prioritizes prompt resolution of preliminary matters; specific legal grounds and factual disputes are identified for the court and the parties through admissions and denials which refine the issues, illuminate the relevance of anticipated evidence, and promote fair play; and a clear scope and standard of review are established in event of appeal.  *See* Pa.R.O.C.P. 3.1-3.15.

Second, though the Orphans' Court Rules unquestionably apply to adoption actions proceeding in orphans' court, *see id.* Rules 1.2, 15.1, in a circumstance unique to the City of Philadelphia, our Constitution places the First Judicial District's adoptions docket within the jurisdiction of its Family Court, Juvenile Division, where an agency-initiated adoption is cross-listed with the associated dependency matter, and the Rules of Juvenile Court Procedure — and motions practice — predominate.  *See* PA. CONST. art. V, §16(q)(iii); *supra* note 2; *see also* Pa.R.J.C.P. 1100, 1133, 1344.  Perhaps as result of this anomaly, or in combination with the atypical circumstances attending virtual hearings during pandemic-related restrictions, no particular procedural mechanisms appear to have been employed in this case.  Rather, a hearing was held more than a year after the motion to intervene was filed, standing was first raised the day prior to the hearing in a memorandum averring a chronology of facts which could not reasonably be assailed or subject to discovery without further delay, and the legal arguments opposing the petition were first raised at the conclusion of the hearing.  Although certain procedural formalities may be modified and defects disregarded by the court, the purpose of a trial court's broad discretion in this area is to fairly promote expeditious resolution of the child's circumstances in a manner that does not affect the substantive rights of the parties.  *See* Pa.R.O.C.P. 1.2; Pa.R.J.C.P. 1126, 1344.  This Court is vested with the constitutional

*parentis* status has been abandoned or terminated — and so with it standing — the inquiry must also consider the reasons provided for periods when parental duties were not performed. Decisions in this regard must be based on competent evidence of record.

Finally, whether such standing endures is a threshold matter, and has no bearing on whether an intervenor's petition will pass muster in a substantive analysis of the child's best interests in relation to further requirements under the Adoption Act or within the court's discretion.

We therefore reverse the Superior Court's decision, and remand to the juvenile court for a hearing *de novo* and proceedings consistent with this opinion before a different judge.[23]

---

authority to administer the procedure and conduct of all courts, *see* PA. CONST. art. V, §10; and thereby, for the purpose of circumnavigating any further delay in this matter, we direct the adoption court, on remand, to set forth and enforce procedural expectations substantially aligned with the Orphans' Court Rules, specifically Chapters III (petition practice), VII (hearings), and XV (adoptions), adapted as needed in the court's discretion to ensure the expeditious and just resolution of this preliminary matter now pending for over two and a half years.

[23] As a final prudential matter, we note the termination of parental rights hearing in this case occurred on March 6, 2017, days prior to the filing of our decision in *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017), and its progeny requiring trial courts, in termination proceedings, to ensure legal counsel is appointed for the child and no conflict exists between the child's best and legal interests if counsel also serves as guardian *ad litem*. *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1236, 1238 (Pa. 2020) (appellate court must perform limited *sua sponte* review of termination of parental rights decisions for trial court's appointment of legal counsel and express ruling regarding conflict between best and legal interests); 23 Pa.C.S. §2313(a) (court shall appoint counsel to represent child in involuntary termination proceeding). The child advocate for K.N.L. has, with laudable commitment, served in this dual role since inception of the dependency matter in 2015, and agrees the trial court did not make such a determination in the underlying matter (which we had not yet articulated as a requirement at the time). Although the role of child's legal counsel is not mandatory with respect to proceedings on an adoption petition, as the child is now twelve years old and formal consideration of the issue is lacking in this record, we suggest the juvenile court perform an updated inquiry into the consonance of the child's best and legal interests.

Chief Justice Todd and Justices Donohue, Wecht, Mundy and Brobson join the opinion.

Justice Donohue files a concurring opinion.

The Late Chief Justice Baer did not participate in the decision of this matter.